UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: ) | |
| ) | |
| JARED LYLE BEAUDIN, ) | Bankruptcy Case No. 09-35557 EEB |
| ) | Chapter 7 |
| Debtor. ) | |

_____

**ORDER**
_____

THIS MATTER came before the Court on an objection to the Debtor's claim of exemption in an individual retirement account (an "IRA"), filed by the Chapter 7 trustee ("Trustee"). The Debtor funded a newly established IRA in the hours before filing his bankruptcy petition from a non-exempt tax refund. The Debtor and his non-debtor spouse had received this tax refund shortly before the bankruptcy filing, which was attributable to the $8,000 first time home buyer's tax credit. Both spouses established IRAs. The Debtor used $3,179.05 from the refund to fund his IRA. The Trustee argues that the Debtor's conversion of a non-exempt asset into an exempt IRA on the eve of bankruptcy should be disallowed as an attempt to defraud creditors. The Debtor counters that he did nothing fraudulent by engaging in prudent pre-bankruptcy planning and making use of the statutory exemptions available to him. Having considered the facts and circumstances presented at hearing, the Court concludes that the Debtor's actions in this case were not fraudulent and that he was entitled to maximize his exemptions in this manner.          .

**I.      RELEVANT FACTORS**

"One of the more difficult issues in bankruptcy law is deciding when, if ever, an intent to defraud creditors can be shown by the debtor's conversion of nonexempt assets to exempt assets." *In re Warren*, 512 F.3d 1241, 1249 (10th Cir. 2008). Admittedly, by distinguishing between an intent to use exemption laws to shield assets from creditors, and an intent to defraud those creditors, "the court is drawing a very fine line." *In re Sayler*, 98 B.R. 536, 541 (D. Kan. 1987). On the one hand, the law encourages debtors to use the exemptions to ensure a "fresh start." *In re Sanders*, 39 F.3d 258, 260 (10th Cir. 1994). The Tenth Circuit has held that "conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled." *In re Carey*, 938 F.2d 1073, 1076 (10th Cir. 1991) (quoting *Norwest Bank Neb., N.A. v. Tveten*, 848 F.2d 871, 873-74 (8th Cir. 1988). On the other hand, pre-bankruptcy planning is not without limits. When there is extrinsic evidence of fraud beyond the act of conversion, or when the act of conversion itself is egregious, a court may find that the debtor acted with the intent to defraud.

In analyzing whether a debtor has crossed the line from legitimate planning to fraudulent conduct, courts utilize many of the same "badges of fraud" that have been developed in connection with fraudulent transfer law. *In re Mueller*, 867 F.2d 568 (10th Cir. 1989); *In re Ludwig*, 345 B.R.

310, 320-22 (Bankr. D. Colo. 2006).  Several of the relevant badges of fraud are set forth in the Uniform Fraudulent Transfer Act ("UFTA").  These factors include: (1) whether the conversion was disclosed or concealed; (2) whether the debtor was being sued or threatened with suit when the conversion was made; (3) whether the conversion was of substantially all of the debtor's assets; (4) whether the debtor absconded; (5) whether the debtor removed or concealed assets; (6) whether the debtor was insolvent or became insolvent shortly after the conversion; (7) whether the conversion occurred shortly before or shortly after a substantial debt was incurred; and (8) whether the debtor retained control of the property transmuted.  Colo. Rev. Stat § 38-8-105(2) (delineating factors derived from UFTA).

While not codified in UFTA, other badges have been recognized by courts.  These other factors include: (9) the value of the asset claimed as exempt; (10) the proportion of the debtor's non-exempt assets converted into exempt form; (11) whether the debtor borrowed funds to acquire the exempt asset; (12) whether the debtor intended to use the exempt asset for the legislative purpose behind the claimed exemption; (13) whether the debtor misrepresented any aspect of the transaction; (14) whether and to what extent nonexempt assets remain available for distribution to creditors; (15) whether the asset was a long-term holding that the debtor converted in contemplation of bankruptcy; (16) whether the debtor's acquisition of the exempt asset deviated from his historical conduct; (17) whether the debtor sought legal advice prior to purchasing the exempt asset, and (18) the proximity in time between the act of conversion and the debtor's bankruptcy filing.  *In re Channon*, 424 B.R. 895, 902 (Bankr. D.N.M. 2010) (and cases cited therein).

Unfortunately for practitioners who wish to know how to properly advise their clients, there is no minimum number or combination of factors that will automatically tip the scale from permissible planning to fraud.  And while the "badges" provide the courts with guidance, they do not compel a particular finding.  "The [finding of fraudulent intent] is fact sensitive with a judge's determination often hinging on whether, in the judge's view of the debtor's attempt to maximize exemptions, 'a pig becomes a hog.'" *Noland v. Wadley (In re Wadley)*, 263 B.R. 857, 860 (Bankr. S.D. Ohio 2001) (quoting *Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 157 (Bankr. D. N.M. 1981)).

## II.   APPLICATION

In this case, several "badges" weigh against allowing the exemption.  First, the timing of the conversion is a factor.  The Debtor opened his IRA account only hours before filing his petition, at a time when he was admittedly insolvent.  By converting the refundable tax credit into an IRA, he also transferred substantially all of his non-exempt assets. While the Debtor turned over to the Trustee $1,100 of his 2009 tax refund, this amount will not contribute significantly to the repayment of his creditors.

Furthermore, the Debtor's acquisition and funding of an IRA deviated from his historical conduct.  He did not have a history of contributing to an IRA or making voluntary contributions to any other form of retirement account.  In his previous employment at a hospital, he had contributed to a state employee retirement account, but these contributions were mandatory and in lieu of social security.  In his present employment, his employer offers a retirement plan, but the Debtor has not

made any voluntary contributions to it. In addition, the Debtor is only 27 years old and is not close to the traditional retirement age.

Several other factors, however, weigh in favor of allowing the exemption. The Debtor fully disclosed the timing and the source used to fund his IRA to his creditors and the Trustee in his Statement of Financial Affairs, schedules, and at his creditors' meeting. There is no evidence that the Debtor was being sued or threatened with suit at the time of the purchase, nor did he have any judgments pending against him. The Debtor did not abscond, nor has he transferred property to others prior to filing bankruptcy. The Debtor did not borrow any funds to purchase the IRA. The funds in question cannot be traced to a long-term investment, such as stocks or bonds, which at the last hour the Debtor decided to convert into an exempt asset. He received the refund in cash only days before filing bankruptcy. Knowing that he was intending to file bankruptcy, he sought advice from counsel about what to purchase with this cash. His attorney advised him to maximize his exemptions in this fashion. On counsel's advice, both the Debtor and his non-debtor wife purchased IRAs in the amounts of $3,179.05 and $5,000, respectively.

The timing of the Debtor's bankruptcy filing also cuts in his favor. He filed his chapter 7 petition on November 30, 2009. He was aware that if he delayed filing his petition until the following calendar year, then potentially no portion of his 2009 tax refund would be property of his bankruptcy estate. Nevertheless, the Debtor chose to file for bankruptcy in 2009 and turned over $1,100 of his 2009 tax refund to the Trustee. Had he waited, then his creditors would have received nothing.

The value of the asset at issue also cuts both ways in this case. The Trustee has argued that, although it is only $3,179, this amount represented more than 50% of the Debtor's non-exempt assets on the date of his bankruptcy filing. It appears that the only other unencumbered, non-exempt asset was the tax refund in the amount of $1,100 that the Debtor turned over to the Trustee. The remainder of the Debtor's assets were either fully encumbered or exempt. From the Debtor's perspective, the amount at issue is relatively de minimus. It would not have made a substantial difference in the repayment of his creditors. He owes in excess of $60,000 in unsecured debts.

The Trustee compares this situation to the facts set forth in *In re Mueller*, 867 F.2d 568 (10th Cir. 1989). In *Mueller*, the debtor purchased a life insurance policy in the amount of $100,000 in the week prior to filing his bankruptcy petition on the advice of his bankruptcy counsel. The debtor paid the policy's single premium of $7,500 with his last nonexempt asset. The Tenth Circuit affirmed the ruling that the life-insurance policy had been acquired with fraudulent intent. In so ruling, the court emphasized the timing of the conversion, the debtor's insolvency at the time of its conversion, and that he had used his last non-exempt asset to purchase the policy. But two other factors entered into the analysis: the debtor already held two other unencumbered life insurance policies and he had misrepresented the intended future use for the new policy to fund his daughter's education. *Id.* at 570.

In *In re Warren*, 512 F.3d 1241 (10th Cir. 2008), a post-*Mueller* opinion, the Tenth Circuit confronted the same issue of pre-bankruptcy conversion of assets, but in a § 727(a)(2) context. In *Warren*, the debtors generated $90,000 in cash by selling many of their nonexempt assets, some at "fire-sell" prices, within four months prior to filing bankruptcy. They then used this money to

3

purchase exempt assets and pre-pay future living expenses. After this pre-petition conversion "frenzy," negligible assets remained in the estate for repayment of creditors. The court affirmed the bankruptcy court's finding of fraudulent intent.

But the *Warren* court expressly declined to find the debtors' pre-petition conversion of assets alone supported a finding of fraudulent intent.

> Although our decision in *Mueller* could support a finding of fraudulent intent based on the [debtors'] frenzy to convert all their assets to exempt assets in the month before filing for bankruptcy, we are most reluctant (for the reasons expressed by Judge Arnold) to recognize a conversion of nonexempt assets as fraudulent . . . .

*In re Warren*, 512 F.3d at 1250. Rather than resting its decision on this basis alone, the *Warren* court detailed the additional evidence that supported a finding of fraudulent intent. This evidence included repeated failures to disclose the transactions, despite the fact that the debtors were both certified public accountants and sophisticated business persons, with a past history of meticulous record keeping. It noted the motivation of the debtors to ensure that their former business partners, with whom they had been embroiled in pre-petition litigation, would not receive anything from their estate. The court pointed to the significant undervaluation of the exempt assets in the debtors' schedules. The prior questionable business practices of the debtors contributed to the court's overall impression as to the debtors' credibility. It relied most heavily on the debtors' sale of a coin collection at a significant loss to the party that had sold them a new home shortly before the bankruptcy, which they failed to adequately disclose. In other words, there were numerous indicia of intent to defraud their creditors in general, and their former business partners in particular.

The Tenth Circuit's reluctance in *Warren* to brand every conversion of non-exempt property into exempt property on the eve of bankruptcy as sufficient evidence by itself of fraudulent intent was based on the concerns espoused by Judge Arnold in both a dissent and a concurrence that he wrote in the companion cases of *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 877-78 (8th Cir. 1988) and *Hanson v. First Nat'l Bank*, 848 F.2d 866, 870 (8th Cir. 1988). In these cases, Judge Arnold highlighted the fact that every debtor claiming an exemption seeks to shield that asset from creditors, which is consistent with the fundamental purpose of the exemption statutes. Therefore, according to Judge Arnold, the act of conversion alone cannot support a finding of fraudulent intent. In *Warren,* the court did not go so far as to embrace Judge Arnold's view entirely. It left open the possibility that the act of conversion on the eve of bankruptcy by itself *may* suffice to establish fraudulent intent. One could imagine that fraudulent intent might be inferred in the case of a debtor who converts a multi-million dollar portfolio into a multi-million dollar homestead on the eve of bankruptcy in a state that allows an unlimited homestead exemption.

In applying these principles, this Court gives greatest weight to three factors. First, the modest amount of the assets in question does not by itself evidence a fraudulent intent. The modest value coupled with the Debtor's full disclosure of the conversion transaction bolsters the Court's view. Finally, there is no evidence that the Debtor sought to evade any creditors. He was not engaged in pre-petition litigation or otherwise attempting to thwart his creditors. In fact, he could have waited one month to file his bankruptcy and then left his creditors with absolutely nothing. Consequently, the Court will not infer a fraudulent intent in this case. The Debtor merely did what

the law allows him to do: he utilized the exemptions available to him.

The Court sympathizes with both the Trustee and the Debtor in this instance. It is very difficult for practitioners to know under the tests articulated when to challenge an exemption on this ground and when to advise a client to take advantage of pre-bankruptcy planning. The *Warren* court acknowledged this dilemma for debtor's counsel in particular. "[T]he same conduct can be malpractice *not* to advise in one jurisdiction, but voidable and grounds for denial of discharge and possibly for disbarment in another. . . ." *Id.* at 1249 (quoting John D. Ayer, *How to Think About Bankruptcy Ethics*, 60 Am. Bankr. L.J. 355, 374 (1986)). For this reason, the *Warren* court went to great lengths to provide as much guidance as possible, by resting its decision, not on this one factor alone, but by pointing out the numerous indicia of fraud. It did not foreclose the possibility of ever finding fraud based solely on the conversion of assets on the eve of bankruptcy, but its cautious approach leads this Court to conclude that the Tenth Circuit would be reluctant to find fraud based on this one factor, absent egregious circumstances. The *Warren* court then reaffirmed that these types of inquiries are "peculiarly fact specific, and the activity in each situation must be viewed individually." *Id.* at 1250 (quoting *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991)). Unfortunately, this requires the Court to determine when a debtor's conduct has been so overreaching and egregious as to render that debtor a "hog" rather than a "pig."

## III. CONCLUSION

Under these circumstances, the Court concludes that the Debtor's use of $3,179 in nonexempt funds to establish an IRA on the eve of bankruptcy was not a transfer made with actual intent to defraud creditors, and therefore his claim of exemption should be allowed. The Trustee's Objection is OVERRULED.

DATED this 25th day of August, 2010.

BY THE COURT:

Elizabeth E. Brown
United States Bankruptcy Judge

5